AUSA: Micah F. Fergenson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

WANJA OBERHOF,

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 1343 and 2;

COUNTY OF OFFENSE:
NEW YORK

26 MAG 3697

SOUTHERN DISTRICT OF NEW YORK, ss.:

Anthony Alecci, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
**(Wire Fraud)**

1. From at least in or about 2022 through at least in or about 2026, in the Southern District of New York and elsewhere, WANJA OBERHOF, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, OBERHOF engaged in a scheme to make false and misleading statements to an investor in a venture called The Healing Company, in order to fraudulently obtain investor money, and sent and received, and caused others to send and receive, electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

**Overview**

2. The U.S. Attorney's Office for the Southern District of New York and the FBI have been investigating an investment fraud scheme related to a venture called The Healing Company Inc. ("The Healing Company") and its affiliated corporate entities. The Healing Company was a start-up venture that, among other things, sought to acquire interests in health and wellness companies. As described further below, WANJA OBERHOF, the defendant, was a co-founder and then the Chief Executive Office ("CEO") of The Healing Company and made misrepresentations to an investor in The Healing Company in order to obtain investor money, and subsequently misappropriated investor funds. In particular, OBERHOF tricked a businessman ("Victim-1) to invest $2.5 million in an affiliate of The Healing Company based on the false promise that Victim-1's funds would be used in substantial part to pay off debt that was encumbering a valuable asset held by The Healing Company. Rather than using the investor's money as promised, OBERHOF misappropriated the vast majority through various money transfers for OBERHOF's personal benefit. For example, OBERHOF transferred, or caused to be transferred: (a) approximately $25,000 of Victim-1's money to pay for OBERHOF's rent at his luxury penthouse apartment in Manhattan (which cost nearly $20,000 per month in rent); (b) over $57,000 of Victim-1's money to repay a personal loan; and, (c) ultimately, over $1.8 million of Victim-1's money to a foreign bank account controlled by OBERHOF. In an attempt to hide the fraud from Victim-1, OBERHOF shared with Victim-1 and others doctored records relating to the

use of Victim-1's investment that, had OBERHOF not manipulated them, would have revealed OBERHOF's misappropriation and the fraud on Victim-1.

**<u>Background on The Healing Company Inc. Leading Up To OBERHOF's Becoming CEO</u>**

3. As described below, there were several corporate entities affiliated with The Healing Company. The parent company, The Healing Company, filed certain reports with the Securities and Exchange Commission ("SEC").[1] Based on my review of certain SEC filings by The Healing Company, I have learned the following:

a. OBERHOF was a co-founder of The Healing Company and its largest equity investor. OBERHOF indirectly held equity in The Healing Company through two foreign entities, including WAOW Entrepreneurship GmbH ("WAOW"), over which OBERHOF exercised control.

b. The Healing Company is a Nevada corporation that previously had a different name and was incorporated in 2008. Following the acquisition of a majority of the voting securities of the Nevada corporation by a foreign entity, the corporation was renamed to "The Healing Company Inc." on or about April 29, 2021.

c. In or about October and November 2021, The Healing Company entered subscription agreements with seed investors, for a total subscribed proceeds of approximately $10 million in exchange for 5 million seed preferred shares. However, the cash proceeds were not all received at that time.

d. In a January 2022 filing, The Healing Company disclosed the appointment of its board of directors, which included OBERHOF's wife.

---

[1] The Healing Company's shares traded over-the-counter on OTC Markets under the ticker "HLCO."

e. In or about March 2022, The Healing Company acquired a German company owned by OBERHOF's wife, for €25,000. That acquired company engaged in direct-to-consumer sales of branded CBD oils and adaptogen products.

f. On or about August 4, 2022, The Healing Company entered a credit agreement with an investment firm (the "Lender"), in which a designated entity acted as administrative agent and collateral agent (the "Lending Agent"), for access to a credit facility of up to $75 million, which could be increased to $150 million (the "Credit Facility"). The Healing Company entered the agreement through a wholly-owned subsidiary named HLCO Borrower LLC, which was the "borrower" under the Credit Facility. Funds drawn from the Credit Facility were used by The Healing Company to acquire certain assets.

g. For example, on or about October 13, 2022, The Healing Company and its subsidiary HLCO Borrower LLC, using $3,000,000 from the Credit Facility, entered an asset purchase agreement to acquire a "superfood" supplement company (the "Superfood Company"). The Superfood Company was to be operated through another subsidiary of The Healing Company. The assets acquired (i.e. the Superfood Company) were held by a newly created subsidiary of The Healing Company, and were pledged to the Lender under the Credit Facility agreement as collateral.

h. On or about March 3, 2023, The Healing Company acquired certain assets from a health and wellness company (the "Wellness Company") founded by a particular author and alternative medicine advocate (the "Wellness Advocate"). The acquired assets were components of the Wellness Company's digital, licensing and consumer products divisions, and included its physical product line, its meditation and wellbeing app, as well as licensed experiences. The newly acquired assets were to be operated through another subsidiary of The Healing Company (the "Wellness Company Subsidiary"). In connection with the acquisition from the Wellness

Company, The Healing Company borrowed $1,582,000 under the Credit Facility, and the assets acquired (ultimately held by the Wellness Company Subsidiary) were pledged to the Lender under the Credit Facility agreement.

i. In or about June 2023, The Healing Company entered a set of agreements with an Indian entity (the "Indian Entity") and an United Kingdom entity (the "UK Entity"). The Indian Entity and the UK Entity were affiliated with a family in India, who are the majority shareholders of one of the largest Indian consumer packaged goods companies and the largest Ayurvedic[2] company worldwide with a $12 billion market capitalization. With respect to the agreement with the Indian Entity, among other things, The Healing Company sold the Indian Entity a membership interest in the Wellness Company Subsidiary for a purchase price of $2.5 million. With respect to the agreement with the UK Entity, among other things, The Healing Company sold the UK Entity a membership interest in the Wellness Company Subsidiary in exchange for intellectual property related to certain products.

j. On or about July 5, 2023, The Healing Company issued a press release regarding $7 million in new funding from "strategic partners" including two family offices, which "[i]ncluding previously announced financing, br[ought] total raised and committed equity funding up to $17M, alongside the $150M Credit Facility supporting future acquisitions." The press release included a quote from The Healing Company's then-CEO, stating in part: "This announcement comes on the heels of record financial performance during the fiscal third quarter . . . ."

---

[2] I know from my review of publicly available information that Ayurveda is an alternative medicine system, which includes (among other things) the use of herbal medicines and special diets, with historical roots in the Indian subcontinent. *See, e.g.*, https://en.wikipedia.org/wiki/Ayurveda.

k. On or about November 13, 2023, the then-CEO of The Healing Company's employment was terminated, and OBERHOF was appointed by the Board as the Interim CEO.

**The Fraud on Victim-1**

4. I have spoken with, and reviewed documents provided by, Victim-1, an investor in an affiliate of The Healing Company, whose funds were misappropriated by WANJA OBERHOF, the defendant. Based on my discussions with Victim-1 and documents provided by Victim-1,[3] I have learned the facts set forth below.

***Victim-1 Invested $2.5 Million Based on OBERHOF's Representations About Paying the Lender***

a. Victim-1 is a German businessman who resides in the Southern District of New York.

b. In or about 2022, Victim-1 met OBERHOF in Germany through a mutual friend whose spouse had invested in The Healing Company. At the time, The Healing Company's focus was on its acquisition of the Superfood Company. On or about September 25, 2022, OBERHOF emailed information about The Healing Company to Victim-1, and thereafter asked if Victim-1 wanted to invest. Victim-1 declined to invest. Victim-1 advised OBERHOF, in substance and in part, that Victim-1 thought the company would not succeed.

c. In or about 2023, OBERHOF moved to New York City and reconnected with Victim-1. OBERHOF told Victim-1, in substance and in part, about the acquisition of the Wellness Company's wellbeing app, which was associated with the Wellness Advocate. Victim-1 had a positive view of the Wellness Advocate and was interested in the Wellness Advocate-related

[3] OBERHOF and Victim-1 often emailed or messaged one another in German. Victim-1 provided certified translations of his German-language email communications with OBERHOF, along with the originals. Any descriptions or quotations herein of documents originally in German are taken from the certified English translations provided by Victim-1.

business. OBERHOF and Victim-1 had discussions about Victim-1's potential investment that continued into 2024, including during in-person meetings in Manhattan.

d. OBERHOF and Victim-1 discussed, in substance and in part, moving the Wellness Company assets to a new entity, in which Victim-1 would invest. Based on OBERHOF's statements, Victim-1 understood that OBERHOF could only transfer the Wellness Company assets if OBERHOF paid back the Lender pursuant to the Credit Facility, because the Lender had control over the assets.

e. Ultimately, OBERHOF and Victim-1 agreed on an investment amount of $2.5 million from Victim-1. OBERHOF told Victim-1, in substance and in part, that approximately $1 million of his investment would be used to pay back the Lender and allow the transfer of the Wellness Company assets to the new entity. Before Victim-1 actually invested, OBERHOF represented to Victim-1 that OBERHOF had reached an agreement with the Lender and OBERHOF needed cash to pay the Lender. OBERHOF further stated, in substance and in part, that once the Lender was paid with Victim-1's cash, Wellness Company assets could be moved into an entity under OBERHOF and Victim-1's control.

f. Based on OBERHOF's representations, on or about May 22, 2024, Victim-1 transferred $2.5 million to Healing & Wellbeing LLC—the new entity set up for Victim-1's investment and to receive the Wellness Company assets.

g. Victim-1 would not have invested if OBERHOF had not told him that he had reached an agreement with the Lender, because the ability to transfer the assets from the Lender's control was a condition for Victim-1's investment.

h. The above-described discussions between OBERHOF and Victim-1, including the use of Victim-1's investment to pay off the debt with the Lender, are reflected in written communications between OBERHOF and Victim-1. For example:

i. On or about April 17, 2024, OBERHOF emailed to Victim-1 draft investment documents, including a draft press release. The draft press release stated that Victim-1 would join the new entity as Chairman and anchor investor. The draft press release further stated, in part: "In conjunction with the leadership announcement, The Healing Company has successfully resolved financing arrangements with [the Lender], essential for supporting initial acquisitions."

ii. On or about April 22, 2024, OBERHOF emailed to Victim-1 revised investment documents, including a revised press release. The revised press release included the same language about having "successfully resolved financing arrangements with [the Lender]." Another document attached, with the header "Taking private of [the Wellness Company] and The Healing Company" included a list of steps numbered 1 through 9. Step 5 was "Invest of USD 2,5 mi[llion] by [Victim-1] into The Healing Company LLC – tbd." Step 6 was "Deal with [the Lender] to take over all assets – until April 26th." Additionally, in OBERHOF's cover email, OBERHOF began the email by stating in part: "Thank you for calling. I will admit I was a bit hasty here, as the debt fund [*i.e.*, the Lender] makes it rather urgent…." At the conclusion of the cover email, OBERHOF stated in part: "I can't extend the debt fund [*i.e.*, the Lender] much longer, so I want to see if we're all set or if we can find an alternative bridge loan for the $1.4 million. Otherwise, I would have to look for an alternative bridge loan very quickly." Based on my training and experience, my interview of Victim-1, and my involvement in this investigation, I understand OBERHOF to be stating that, if Victim-1 did not send his $2.5 million investment promptly, OBERHOF would need to borrow funds "very quickly" from a different lender (the "alternative bridge loan") in order to pay off the debt to the Lender and unencumber the Wellness Company assets.

iii. On or about Friday, May 17, 2024, OBERHOF emailed to Victim-1 final investment documents, which did not include a press release. In his cover email, OBERHOF wrote

in part: "After quite a bit of back and forth with [the Lender] we keep the structure as discussed. [. . .] As I have to pay the debt fund next week and can't prolong it any further it would be great if we can finalize over the weekend." Among the documents attached to the May 17, 2024 email was a one-page document with the title "Intended Future Captable[4] of Healing and Wellbeeing [sic] LLC LLC [sic]." The captable indicated that the shareholders of the new entity would also include "HLCO Inc. shareholders"—*i.e.*, investors in The Healing Company.

iv. A few hours later, on or about Friday, May 17, 2024, OBERHOF emailed Victim-1, stating in part: "After finalizing all steps with [the Lender] and closing our deal, I would love to double down on the operational improvements [of the business]." OBERHOF then listed an agenda with bullet points.

***Instead of Paying the Lender, OBERHOF Misappropriated Victim-1's Investment***

5. Based on my review of account information from a fintech company that has a banking relationship ("Bank-1"), I have learned the following:

a. On or about May 22, 2024, Victim-1 transferred $2.5 million to Healing and Wellbeing LLC. Instead of using Victim-1's investment to pay off the debt owed to the Lender, as OBERHOF represented to Victim-1 he would do, WANJA OBERHOF, the defendant, misappropriated it, as described below.

b. The bank account that received Victim-1's $2.5 million investment on or about May 22, 2024, was the account ending in 7524 at Bank-1 (the "7524 Account"). OBERHOF was the controlling person and ultimate beneficial owner of the 7524 Account. In addition, two other employees at The Healing Company ("Employee-1" and "Employee-2") were listed as "admins" on the 7524 Account.

---

[4] Based on my training and experience, I know that a capitalization table (captable) is a document that details a company's equity ownership structure.

c. Prior to receiving Victim-1's $2.5 million investment, the 7524 Account had a balance of zero dollars. After receiving Victim-1's $2.5 million investment, Victim-1's funds were dissipated in seven transfers, none of which were to the Lender. These outgoing transfers occurred over the course of approximately one week, during which the 7524 Account received no other incoming deposits. By on or about May 30, 2024, only approximately $60,212.30 of Victim-1's investment remained.

d. Rather than being used to pay off the debt to the Lender, Victim-1's funds were used as follows:

i. On or about May 23, 2024, approximately $347,287.70 was transferred to a law firm (the "Law Firm").

ii. On or about May 23, 2024, approximately $57,500 was sent to a particular LLC (the "LLC").

iii. On or about May 24, 2024, approximately $20,000 was sent to the Superfood Company.

iv. On or about May 24, 2024, approximately $15,000 was sent to the Wellness Company Subsidiary.

v. On or about May 28, 2024, approximately $247,500 was transferred to WAOW entrepreneurship GmbH ("WAOW") at an account held in Germany (the "WAOW German Bank Account").

vi. On or about May 30, 2024, an additional approximately $544,500 was transferred to the WAOW German Bank Account.

vii. Also on or about May 30, 2024, an additional approximately $1,188,000 was transferred to the WAOW German Bank Account.

6. As noted, none of these transfers was to the Lender. Further, as described below, the transfers to WAOW and the LLC appear to be for the personal benefit of WANJA OBERHOF, the defendant.

a. Based on discussions with Victim-1, I know that Victim-1 understood that WAOW was OBERHOF's family office. Based on my review of the emails described above, I have learned that OBERHOF's email address used "waow" in its domain.

b. Based on my discussions with employees of the business that operates the LLC, I have learned that the LLC—which received approximately $57,500 of Victim-1's investment—is associated with a business that provides loans to individuals who secure the loans by pledging luxury assets as collateral (the "Luxury Asset Lender"). Based on records provided by the Luxury Asset Lender related to OBERHOF, I know that OBERHOF obtained a personal loan from the Luxury Asset Lender by posting a painting as collateral. The approximately $57,500 of Victim-1's investment was used to repay OBERHOF's personal loan.

7. Based on the Bank-1 records and other evidence described below, the misuse of funds from the 7524 Account by WANJA OBERHOF, the defendant, continued beyond May 2024. In or about June and July 2024, there are additional outgoing transfers from the 7524 Account that appear to be for the benefit of OBERHOF and do not appear to be related to The Healing Company's business.[5] For example:

a. On or about June 11, 2024, approximately $25,000 was transferred to a particular LLC named after an address in Manhattan (the "Manhattan Address"). Based on my discussions with a representative of the property manager of the Manhattan Address, and my review of records

[5] There were additional incoming transfers to the 7524 Account during June and July 2024, which—excluding the $500,000 incoming transfer described in paragraph 7(d)—totaled approximately $25,575.

provided by the owner of the property, I know that OBERHOF rented a penthouse apartment at the Manhattan Address from in or about February 2024 to in or about February 2025. The monthly rental payment for OBERHOF's penthouse was approximately $19,995. As of June 11, 2024, OBERHOF's rental payments were in arrears, and this June 11, 2024 transfer was used as payment towards the approximately $61,000 that OBERHOF owed in rent.

b. On or about June 25, 2024, approximately $20,000 was sent to an entity named "Consulting C1760," with a reference line that appears to refer to a particular art gallery. I am not aware, through my investigation, of the art gallery having a connection to The Healing Company's business.[6]

c. On or about July 3, 2024, approximately $15,000 was transferred to a particular individual ("Individual-1"). I am not aware, through my investigation, of Individual-1 having a connection to The Healing Company's business. Rather, based on publicly available information, Individual-1 appears to be involved in cryptocurrency ventures in Berlin, Germany.

d. Finally, there were two additional transactions with the WAOW German Bank Account. On or about June 6, 2024, the 7524 Account received approximately $500,000 from the WAOW German Bank Account. However, the following month, on or about July 16, 2024, approximately $326,700 was transferred back to the WAOW German Bank Account. Thus, accounting for the approximately $173,300 transferred from the WAOW German Bank Account to the 7524 Account that was not transferred back to the WAOW German Bank Account, the WAOW German Bank Account received net proceeds of approximately $1,806,700 from the 7524 Account.

[6] I have spoken with a representative of the art gallery, who indicated that the art gallery's name is being used by an individual no longer associated with the art gallery.

***The Lender Sued The Healing Company and OBERHOF in August 2024***

8. On or about August 28, 2024, the Lender's Lending Agent filed a civil complaint in New York State Supreme Court bringing, among other claims, civil fraud claims against The Healing Company and affiliated entities, WANJA OBERHOF, the defendant, and other individuals. Among other things, the Lending Agent alleged that:

a. By early 2024, The Healing Company had defaulted on its Credit Facility.

b. Rather than repaying the Lending Agent, in or about May 2024, The Healing Company sought to evade the security interest that the Lending Agent held on The Healing Company's assets by filing an "Assignment for the Benefit of Creditors" proceeding in New Jersey state court.[7]

***OBERHOF Doctored Financial Records in October 2024 to Hide the Misappropriation***

9. Based on my review of records provided by an individual who advised The Healing Company ("Advisor-1"), I have learned the following.

a. On or about October 24, 2024, WANJA OBERHOF, the defendant, emailed Victim-1 and Advisor-1, among others, attaching two excel files, including an excel file (the "Spreadsheet") that purportedly showed, as stated in OBERHOF's cover email, "the use of proceeds of the USD 2,5 mi[llion] since [Victim-1] invested."

b. In fact, while the Spreadsheet contained some of the outgoing transfers from the 7524 Account, certain outgoing transfers described above in Paragraphs 5 to 7—involving the Luxury Asset Lender, the WAOW German Bank Account, the Manhattan Address, the art gallery reference, and Individual-1—were omitted from the Spreadsheet.

---

[7] Based on my training and experience, and my discussions with other law enforcement officers, I have learned that an "Assignment for the Benefit of Creditors" is a voluntary, state-law process where a financially distressed business transfers its assets to an independent third party to be liquidated and distributed to creditors. It is a less formal alternative to federal bankruptcy.

c. For example, while the incoming transfer of approximately $500,000 from the WAOW German Bank Account was included in the Spreadsheet, the *outgoing* transfers of net proceeds of approximately $1,806,700 to the WAOW German Bank Account were *excluded* from the Spreadsheet.

d. Further, the Spreadsheet purportedly showed that on or about September 18, 2024, $1.35 million of Victim-1's investment proceeds were transferred to the Lender. No such transfer exists in the records for the 7524 Account.

***OBERHOF Doctored More Records and Lied When Confronted by Victim-1 in December 2024***

10. Based on my discussions with Victim-1 and my review of certain emails and audio recordings, I have learned the following:

a. In or about December 2024, a particular employee of The Healing Company ("Employee-1") notified Victim-1 of how his investment had in fact been spent and emailed certain documents to Victim-1.

b. Employee-1 worked on finance matters at The Healing Company.

c. On or about December 17, 2024, Employee-1 emailed Victim-1 and Advisor-1 with the subject line "documents," and wrote: "please see attached as discussed." Attached to Employee-1's email were monthly statements for the 7524 Account from May through November 2024—which match the monthly statements that have been provided to me directly by Bank-1 in this investigation—as well as an excel file that summarized the financial activity in those months. These records reflect the outgoing transfers described in Paragraphs 5 and 7, *supra*, that had been omitted or deleted from the Spreadsheet that WANJA OBERHOF, the defendant, sent to Victim-1 on or about October 24, 2024.

d. The same day as Employee-1's email, on or about December 17, 2024, Victim-1 emailed OBERHOF and requested financial documents. Specifically, Victim-1 emailed OBERHOF in part:

> As we discussed previously, could you please send over the following documents:
>
> - Profit & Loss Statement
>
> - Balance Sheet
>
> - Bank Account Statements (before and after the date of my $2.5 million investment), including details on key transactions like loan settlements, sale of [the Superfood Company], split out [the Wellness Company] franchise agreements, legal fees, and any other relevant cash flow information.
>
> - Executed Purchase Agreements and a summary of any outstanding items that need to be concluded
>
> Could you get me the documents until end of the week. So, if I have any questions, we can talk about it during our regular call on Friday.

e. On or about Friday, December 20, 2024, OBERHOF emailed Victim-1 and Advisor-1, copying Employee-1. OBERHOF wrote in his cover email, in part: "Please find attached also the 11.1 to 15.12. [sic] cash report which shows a minus of USD 30.000 on cash which is less that [sic] planned, as we have not started marketing…" Attached to OBERHOF's email was an excel file named "Cash Summary_11.1.24-12.15.14.xlsx" (the "Doctored Cash Report"). Among other things, the Doctored Cash Report, which I have reviewed, listed the beginning cash balance, as of November 1, 2024 held by Healing & Wellbeing LLC. According to the Doctored Cash Report, the amount of cash held by Healing & Wellbeing LLC on November 1, 2024 was $287,940.32.[8]

---

[8] The Doctored Cash Report listed other affiliated entities' cash as well, for a purported total cash balance of approximately $345,001 as of December 15, 2024.

f. Also on or about Friday, December 20, 2024, shortly after OBERHOF emailed the Doctored Cash Report, Employee-1 emailed Victim-1 separately, writing "This is the file that I actually sent Wanja [OBERHOF] regarding cash." Attached to Employee-1's email was an excel file with the same name as the Doctored Cash Report (the "True Cash Report"). In the True Cash Report, the amount of cash held by Healing & Wellbeing LLC on November 1, 2024 was $7,940.32—that is, $280,000 less than the version OBERHOF sent to Victim-1.

g. As reflected in records provided by Employee-1, Employee-1 had emailed the True Cash Report to OBERHOF ("Email-1") prior to OBERHOF's emailing the Doctored Cash Report to Victim-1. On or about March 18, 2025, Employee-1 forwarded Email-1 to his personal email account, writing: "Sending for my records. This file is different (truthful and accurate) from the version that Wanja [OBERHOF] sent to [Victim-1]."

h. Based on my review of email communications, after OBERHOF circulated the Doctored Cash Report on or about December 20, 2024, OBERHOF had a call that day with Victim-1, Advisor-1, Employee-1, and another employee of The Healing Company ("Employee-3"). Advisor-1 and Employee-1 made separate audio recordings of the call, which I have reviewed. During the call, Victim-1 asked OBERHOF if "the current cash in the bank" was approximately $345,000 (consistent with the Doctored Cash Report).[9] OBERHOF responded, in substance and in part, "Exactly."[10] That statement was false; as described above, OBERHOF had received the

---

[9] As noted, the Doctored Cash Report had shown a purported total balance of approximately $345,001 as of December 15, 2024. Prior to the December 20, 2024 call, Employee-1 had emailed to Victim-1, copying OBERHOF and Advisor-1, a spreadsheet that showed a purported cash balance as of December 20, 2024 of approximately $345,706.

[10] Additionally, OBERHOF claimed that approximately $1.3 million of Victim-1's investment was being held in escrow at the Law Firm (*i.e.*, the law firm that had received $347,287.70 of Victim-1's investment on or about May 23, 2024). Based on my review of bank records for the 7524 Account, there was not an outgoing transfer of $1.3 million to the Law Firm. Additionally, I have reviewed bank records for the Law Firm's bank account that received the $347,287.70, and did

True Cash Report but had manipulated it to produce the Doctored Cash Report. At the end of the call, Victim-1 requested a refund of his investment from OBERHOF.

i. On or about December 20, 2024, following the call, Victim-1 emailed a letter to OBERHOF, which stated in part: "As we discussed verbally, I have recently uncovered significant misrepresentations regarding the current legal state and operations of the company. These discrepancies contradict the information provided to me at the time of the investment, thereby undermining the basis of my financial commitment."

j. On or about December 26, 2024, OBERHOF replied to Victim-1's email. OBERHOF wrote in part: "I vehemently deny the allegation that I intentionally misled you or withheld information from you at the time of your investment. **In retrospect, however, I clearly made a mistake after your investment by not keeping you openly informed about all developments**. As late as August 16, the [Lender] closure was still an agenda item in my email[[11]] (which shows that we didn't have everything worked out in May)...." (emphasis in original). OBERHOF also wrote in part: "**I will refund your invested capital in full**. Unfortunately, it's impossible for me to meet the December 31, 2024 deadline, since I do not have those liquid funds right now, and I can't find anyone to advance such a large sum that quickly. I plan to refund the money in full by January 31, 2025 [...]" (emphasis in original).

11. Based on my discussions with Victim-1, information provided by Victim-1's attorney, and records provided by Victim-1, I have learned that WANJA OBERHOF, the

not find an incoming transfer of approximately $1.3 million from Healing & Wellbeing LLC, other known affiliates of The Healing Company, OBERHOF personally, or WAOW.

[11] On or about August 16, 2024, OBERHOF emailed Victim-1 a bulleted agenda. The first bullet was "Structure," and one of its sub-bullets was "Deal [the Lender] closing." Approximately five weeks earlier, on or about July 4, 2024, OBERHOF emailed Victim-1 stating in part: "Unfortunately, things with [the Lender] were a bit difficult again - they tried to bring up the topic three times. But now it is all signed and sealed, and all assets will effectively be in [a newly-created entity] next week as a wholly owned subsidiary of Healing & Wellbeing LLC."

defendant, did not refund Victim-1's investment in full by January 31, 2025, and still has not. Rather, OBERHOF has sent four payments to Victim-1, totaling approximately $575,000.[12]

WHEREFORE, I respectfully request that a warrant be issued for the arrest of WANJA OBERHOF, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

Anthony Alecci
Special Agent
FBI

Sworn to me this 9th day of September, 2026.

THE HONORABLE JENNIFER E. WILLIS
United States Magistrate Judge
Southern District of New York

[12] Civil attorneys for OBERHOF have been in periodic contact with attorneys for Victim-1.